Good morning, Your Honor. Stephen Abraham for Appellants, Purely Juice, and Paul Hatchigan. May it please the Court. The briefs have adequately stated most of the positions of the parties with respect to nearly all of this case, so I'd like to spend what time we have this morning to discuss one issue, my goal in three parts. The question of whether or not an individual officer should be held liable for a violation of the Lanham Act, and what degree of culpability, if any, is required. The District Court held that Paul Hatchigan was individually personally liable for the consequences of a third party introducing an adulterated substance into a component of juice. She held him personally liable under a should-have theory, the theory being that he should have known, and as a result, he is liable. She indicated that he is directly liable. In short, what the Court held is that a certain amount of information will be imputed to an individual, and on that basis, that individual officer, though he engaged in no conduct, having any measure of contribution to the wrongful conduct, can now be liable. So he knew of the nonconforming products as early as February 2007 when he got those first reports from Silica, right? In fact, what he knew, Your Honor, was that there was a problem. The problem was identified not in terms of any empirical statement of adulteration. He gets back test results. They say, something is different in the way we ordinarily see measurements or values for your product. He immediately calls for the ---- But wait. Ordinarily see? The test that they employed before would not have detected this, correct? Correct. What's the ---- What he learns is there's a new test that might be more accurate, correct? It's not that there's a new test, Your Honor. It's that there was a test that was not traditionally applied by anyone in the industry. Or I don't mean new in the sense it was made up the day before, but new in the sense that they hadn't used it. Correct. New in the sense ---- And so he knew that the test then being applied was showing results different from and more ---- and worrisome, calling into question the validity of the previous test, correct? Absolutely. And what he did at that point then was he went back to the broker, said, tell me what was done to confirm the validity of this product. The industry had relied on certificates. He said, make sure that these certificates go to this product. He asked the broker, have you had any problems with the supplier, with this distributor, with this manufacturer? And the answer kept coming back. Answers consistent with the type of So he just takes it at face value, which I think was what the district court was holding or suggesting that. He didn't do any inquiry. He didn't do any interviewing. He just says, are you reliable? And they said, yes, and that's enough. In fact, he didn't just do that, Your Honor. What he did was he not only asked the broker what was being done, but immediately then sent out samples for testing. You have to a lab report that didn't even indicate that the product was his. It was all blotted out. So a competitor has told you, hold all of your product. Withdraw all of your product. Remove yourself from the marketplace because we have proof that you've done something wrong. Certainly one of the approaches could have been for him to have said, you're right. Why doesn't this amount to a reason we should have known that there were some issues putting him on notice to go and do additional inquiries? I'm having trouble understanding that. I'm sorry. When that letter came was the first time that he was put on notice that there was a potential problem. Well, he got the results from silica, right? Showing that there was sucrose. And then he got the letter from Palm a little bit later the next month saying that their product contained little or no pomegranate juice. And then they did further tests, all of which or many of which showed that the juice contained sugars and wasn't pure pomegranate juice. So it seems like there was a sequence of events. And you're saying, well, it could have been something else. But on the other hand, it could have been a problem with the juice. It certainly could have been a problem with the juice. And what they did at that point was the moment they got back the first result and called into question the quality, they went first to what had been the traditional line of analysis by the industry. They looked at certificates. The certificates certainly seemed valid. There had never been a basis or a reason for questioning the certificates before. But he went back and questioned them. He specifically asked what had been done to confirm. And the broker came back and said, we've never had any problems with this. They then immediately sent out the product for more testing. And when those test results came back, and it's important, when those test results came back, within three days, all of the product was held. That goes to the question. But not removed from the shelf, right? So he held the product that had been shipped out, but decided not to take steps to pull it back from the shelves where the consumers were. The reason it wasn't pulled back from the shelves is because there was testimony, and there was no contrary testimony, that the life cycle of a shipped product, once it left the distribution centers, was approximately four to six weeks. So by the time they got back the test results and within three days ordered the withdrawal of all the product sitting at the distribution center, more than six weeks had passed since the time that it was put on the shelves. In fact, the very fact that there was, I'm sorry, the likelihood of there being none of that product left on the store shelves was confirmed in essence by the very fact that plaintiff going out, sampling products, doing testing not only on Pure Juice's products, but others, could not in a single instance, after the first battery of tests, after the February time frame, when in March they did more testing, find any product from that original lot, that original concentrate lot that had likely been adulterated. Not one test is done after that test result comes back. When Paul Hatchigan says, pull everything, the only thing that is left outside of a few bottles that may sit in a consumer's home, if even that are what is sitting at the warehousing, at the distribution centers, there's nothing left on the shelves. But the court went even further. It said, even if you didn't have those test results, you should have known. You should have known for two reasons before any testing was done. Before you go on though, are you not saying that there was reason to believe that a particular lot no longer remained on the shelves? That there was lots of product out there on the grocery store shelves, was there not? There was in fact very little. The evidence was that these are, it's a very quick turn over product. You don't, you know, it's not like a shelf stable item where you may put This is a perishable item. It's a fresh juice in the refrigerator section. So as of what date was all of Purely Juice's product off the store shelves? The testimony was that within four but no more than six weeks, so generally 30 to 45 days, anything that would have been on a store shelf would be gone. And there was absolutely no evidence of that. And nothing more was going out. And nothing more was going out. What Purely Juice did was freeze it. The moment they got the test results back that confirmed, that is the second battery of tests that came back I believe at the end of February, that there was a problem. One that they could not attribute to anything else, any natural process. They went to the distribution centers. They said do not ship this out. And they shipped through a new product. And so then the second batch that was the enjoy-by dates of August 4th, August 28th and August 30th, the test results showed that those two were not pure and had additional sucrose. If I can address that very specifically, that goes to the question and I'll take it as the third part. What Palm did in its argument before the district court was begin with the notion of adulteration. They have no issues with adulteration. But then when they did halfway through was shift to the notion of not pure. Not pure is a problematic term, problematic definition for a number of reasons. One of which is that it is not any part of the FDA's regulatory scheme. Let me talk to you about the FDA for a moment. I was a little curious about that, about whether the issue is not so much whether it's the FDA is preempted. Because there's nothing expressed in the FDA about preemption. But it sounded like the courts were relying more on a abstention doctrine saying, you know, like a primary jurisdiction doctrine where the FDA, where we would be required to analyze or apply FDA regulations. We should let the If that's not your argument, this sort of abstention argument, where would we find something as specific as the court said was necessary in YFV-Levine where the FDA is preempting the state law tort claims or federal law claims to go forward? I understand in the context of the application of the FDA's regulations, oftentimes there is this distinction made between preemption and the primary jurisdiction. The question of whether or not there should be two co-extensive sources of enforcement or of regulation. The problem here is that the FDA had very specifically not used pure, because pure is not itself a quantitative statement of value or measure. But here's no claim is being brought under the FDA. There's no violation of FDA standards claim being brought. So that's not really an issue for us. But the issue is, in fact, because what the judge was doing was deciding two things. The first was whether or not purely juice and Paul Hatchigan had in the face of evidence of a particular problem, so to speak, reformed themselves. Because if, for instance, you look at Microsoft versus computer Wait, let me ask you this. The label on the bottle didn't change at any point, did it? The label on the bottle had not changed since inception. So what's found out there in August was still making the same representations that were false with respect to the product that were pulled out of the loading room. The representations that were made on the products that had a best use by date in August were, in fact, not true. I'm sorry. The claims regarding the products were not true. And in that regard, I would like to point out what has been expressed in the record. Kruger Labs did an analysis of the concentrate that was used for the July and August best use by date products. And, in fact, as an example, at the record at 679, found that concentrate to be pure. So the concentrate was pure. Now, added to that were water and natural flavorings. What the Court concluded, if you look at the statement of decision at 56 to 58, is it's not pure. But the problem is what the Court seized on is a term that was not used qualitatively, I'm sorry, quantitatively or substantively to describe anybody's product. And by that, what I mean is that her objection in the statement regarding the second-generation products was that it wasn't pure. And by that, what Palm's own expert had said was, if you add anything other than water, if you add anything other than water to concentrate, your product isn't pure. But it can still comply with the FDA's regulation. And this was in the deposition of Dana Kruger that was lodged. I guess I've lost, because I thought this was a false advertising case. The problem is that, in fact, the case is divided into two parts. The first goes to the question of whether there was a nonconforming product. That was, by the terms of the label, literally false. As to the company's liability for that period of time, as I indicated earlier, I'm not here to address that. I think it's in the briefs. The question is whether a company could be held liable for the actions of a third party. The problem I have is in the second-generation of product. That is, when they get new concentrate, Plano's own expert says, this is pure concentrate. They take that concentrate. They add water to it. They add natural flavorings. And now the court says, well, because you added natural flavorings, it's not pure. Pure is never the standard. There's nothing on the label that says pure. And Palm's own president, in the record at 131, says if you add... What natural flavorings are we talking about? The natural flavorings are very small amounts of concentrate of juices and juice extracts. Other juices. Other juices. Well, this says 100% pomegranate juice, and that says no added sugar on the label. And I thought the issue was that there was added sugar, sucrose was found, and it wasn't... In some cases, I don't think they said it was other juices. They said it was just corn syrup. What was it? Corn syrup. In the first generation. Yeah. In the second generation, Palm's own president said, in the record at 131, if you add flavorings, is that still pure pomegranate juice according to your use of the word? Now, this is to Palm. And he says, probably. Obviously, our juice has natural flavorings, as does purely juice, as do, in fact, most 100% pomegranate juices on the market. What the judge did was she took the 100% juice, she eliminated that, she put in the word pure and said if it's not concentrate and water, it's not pure, therefore it's a violation. This is, in fact, incompatible with the FDA's regulations. Incompatible. And as a result of which... I guess I'm still not understanding why the FDA's regulations are significant here. The question is what was the market's view of 100% pomegranate juice, no sugar added, presumably meant 100% pomegranate juice, no sugar added. It didn't presumably mean that. What it meant was that... That was the evidence, right? That was brought out prior... The evidence was that so long as you have, and you could have concentrate, water, and you could have other natural flavorings. And there was a percentage that they couldn't exceed. What do you mean you say you can have? Where do you get that? To do what here? The FDA regulations and the interpretations of the FDA regulations... But that's to avoid a violation of the FDA regulations, which seemed to me... That's a red herring, isn't it? I don't understand. It's absolutely not a red herring, because 100% juice does not, under any of the criteria that are established, unless the judge is engaging in what I think is not a coextensive creation of a regulation set, but is in fact saying now that 100% juice can only be... Pomegranate juice. Did it market this as 100% pomegranate juice? It was marketed as 100% pomegranate juice according to the criteria set by... Well, if I, just as a consumer, if I see that, I don't think it's got orange juice in it. But the problem is, as Matthew Tepper, the president of Palm himself said, he said, our product, Palm's product is marketed as 100% pomegranate juice. It had natural flavors in it also, and that was the evidence. So what the judge said was, everybody is doing it, even the plaintiff is doing it. I'm going to declare a new rule set for how we will enforce the claim, the Lanham Act claim for 100% pomegranate juice against purely juice, but not against POM. But aren't you arguing that because the other guy did it, it's okay that I did it? Absolutely not, Your Honor. What I'm arguing is that it's okay because somebody else did? What I'm arguing is the question of the notice that was given to an officer of corporation that resulted in liability against him personally. And the problem here is that it wasn't just that the industry was doing it. This isn't a case of lemmings. The case was that POM itself was doing it. POM claimed as to the second generation. Remember that the phrase had been 100%. They changed it to pure mid-trial. I think we understand what you're saying, and you've more than used your time. You're over. Thank you, Your Honor. So we should hear from your adversary. Thank you. Please record Mark Campbell for the plaintiff, POM Wonderful. There's a little confusion here, I think, in terms of what appellant is trying to describe as adulteration. You start every 100% pomegranate juice product off with a concentrate, a concentrate of real 100% pomegranate juice. The problem in this case wasn't natural flavors or the addition of water. The problem in this case was that the starting point, the pomegranate juice concentrate that was purchased from the broker overseas, was not 100% pomegranate juice. And when the experts in this case tested the pomegranate juice, whether it was concentrate or a finished product, they looked for markers. Is this really pomegranate juice that we started with? Was the starting point in this case pomegranate juice? And the experts looked at it, and they concluded it was not. There's various analytical markers that they looked to, and they looked to those markers, and they concluded this is not pomegranate juice. The starting point is not pomegranate juice. So when you label something as 100% pomegranate juice where the starting point isn't pomegranate juice, that's the problem. And that's the problem that this report identified in finding Mr. Hatch again and purely disliable. There's some discussion about the later test and what those meant. What those later tests showed was that there was some additive, whether it be sucrose or some nonconforming additive, that changed those analytical markers, that told an expert, that told the court, that the later pomegranate juice sold through August of 2007, that it had been altered, that it had been adulterated, that it was not real pomegranate juice as the starting point. Those analytical markers really don't test the natural flavors. The analytical markers aren't looking at the natural flavors. They're looking to see if the base, the starting point of the product, is actually pomegranate juice. How can they tell that if there have been later things added to it? How do they isolate the base from a bunch of... I'm clearly not a scientist. It's interesting. There were several scientists that testified on the subject. There was Dr. Heber from UCLA. There was Dr. Kruger from Kruger Laboratories. And there was Charlie Winnie, who was an expert on authenticity testing. I don't purport to understand the science, except to say, they can literally go into a product and dissect it and find the markers that you would expect to see, whether it be anthocyanin profiles, for example, which are one of the markers the court looked to, carbon-13 testing, that they can actually break down the product and determine whether the starting point of that product was really 100% pomegranate juice. With respect to Mr. Hatch again and what he knew or didn't know, even going back before he received the silica test, there was evidence on the record that he knew there was a problem in this market. He wasn't naive. He did these sensory tests when he received the pomegranate juice concentrate. He smelled it.  And when asked why they did that, they said, well, we wanted to make sure there were no foreign objects. Well, what foreign objects, his flavor chemist was asked, or his flavorist, I think is what his title does. And he said, well, things like grape juice and apple juice. Well, that's the adulteration we're talking about. Overseas, when they run short on pomegranate juice in the concentrated form, they add other concentrates to it in order to expand the product. And, of course, apple juice and grape juice, those are cheaper products than pomegranate juice. So you can cut that product with these cheaper products in order to make it go further. And that, throughout the trial, was recorded as to what exactly was going on in this industry. The district court seemed to rely, though, on a couple of matters that weren't supported in the record. Like it relied on an internal memo to POM pointing to a newspaper article with no evidence that Purely Juice had reviewed that newspaper article. And then there was some evidence of the price of pomegranate juices that was presented for 2006 in the testimony. And the district court said, well, because there was a difference between the 2007 price that Purely Juice paid and the 2006, they even stood for 2007 evidence, he should have known. So those two things didn't seem to be supported. Do you agree with that? And if so, how can we agree with the district court? I actually don't agree with those. Let me start with the pricing. The pricing was evidenced by Purely Juice's own records in terms of what they were paying for pomegranate. What they were paying, but the market, the testimony that the district court points to related to 2006 pricing, not 2007. You know, Mr. Tupper testified. He's the president of POM Wonderful. He's in the industry. He's tracked those pricings. He's tracked what competitors are doing. He has purchased pomegranate juice from foreign corporations. His testimony was that he is familiar with the pricing. And he testified as to the range of pricing. And where was that? Because all I saw being pointed to was that the question was, and in the 2000, this is on AER 127. And in the 2006 period, was there an established market rate for foreign source pomegranate concentrate? Answer, it was. It ranged between $30 and $40 a gallon. But I didn't see anything for 2007. I don't have that right in front of me, Your Honor. But in the record, there was testimony both from Mr. Tupper, from the broker that sold the pomegranate juice concentrate, as to what the pricing ranges were. And her testimony was consistent with Mr. Tupper. She said there were ranges of pricing. She explained those ranges not based on adulteration. Her explanation was, well, product could be older. Product could be from an area where, you know, things may be cheaper. You may get a better price because you're buying in bulk or you're paying in cash. She talked about the same price range. The price range, I don't think, really is disputed as to what it was in 2007. As one witness for the plaintiff testified, excuse me, for the defendant testified, you get what you pay for. And that was the point that the district court was making. When you looked at the pricing, immediately upon being called out as to the quality of their product, you see what happens to the price that the appellant is paying. That price skyrockets 40%. And that's telling. It's telling because you do, in fact, get what you pay for. If you're paying on the low end of the range, and we know within days there was a spike, and there was no testimony in the record as to anything that would have caused that spike, other than I think there was some testimony or suggestion that it was the payment terms. But the court was free to look at that as compelling evidence as to what they were actually buying at the time. With respect to this internal memorandum, there was actually more testimony than just this memorandum. And the court, in its findings, cites to that as the evidence. But Mr. Tupper was asked about what was going on in the industry at the time. And he specifically testified about the article referred to in that memorandum. It wasn't a secret article that was hidden in the bowels of Palm Wonderful. It was an article that was published through a European publication that was available in the industry that Palm Wonderful was certainly aware of, that you may recall in the record that appellant's own expert, a company called HADS, was also well aware of. There's a March 2007 memorandum that is sent to appellant that says, hey, there's a shortage in the pomegranate juice market, and you'd better look out for adulteration. It's a problem. And so it wasn't just an internal hidden memorandum of Palm Wonderful. It was evidence that was out in the public, out in the industry, both in the form of the article that's referred to in the internal memorandum, but also in the form of a letter that appellant received from their own expert they had been consulting with. So it wasn't limited to the memorandum that the court cites to. Granted, the court, I agree, cites to that, but there was certainly plenty in the record to show that this was an industry-wide problem that people knew about. So that goes to more to should have known than actually knew? At least with respect to this one article. There's no evidence that Mr. Sheegan read that article, correct? That's correct. And that goes to the should have known. But in terms of actually knew, I was starting to get into that discussion in terms of what they were doing. The folks at Purely Juice were doing this century testing because they were looking for foreign objects. They knew it. They knew foreign objects existed. That's why they're smelling the product, tasting the product, looking at the product for coloration, because they knew. Why else look if you didn't expect adulteration? They also talked about the credibility of suppliers, that they were concerned about the suitability of products, the credibility of suppliers. Why in the world would you have those concerns if you didn't suspect or know, frankly, about the issue of adulteration? They also were internally creating their own testing standards, the same standards, by and large, that Dr. Kruger used, the same standards that the Hadds Laboratory used, the same analytical markers that I spoke about a moment ago. They were setting those up internally at the very time this adulteration was discovered. It shows that they did know there was an issue of adulteration. It wasn't the article alone. It wasn't any one of these. But when you put all of these together, certainly they should have known. And, in fact, their own actions show that they did know there was an issue of adulteration. Would it be your view that's enough, even if we can't find any evidence in the record, to support the proposition that the prices paid in 2007 were below market? Absolutely. It's more than that, Your Honor. In terms of Mr. Hatchigan's personal liability, there was evidence in the record, and part of this was discussed during the appellate's argument. You start at the point of the silica lab test, and we talked about what he knew or should have known up to that point in time. He gets a lab test from silica that says not just that there may be something wrong here. It says there's sucrose here. And at the time, all the industry standards said that's something that doesn't naturally occur, at least not at the levels that were observed in pomegranate juice. And so Mr. Hatchigan was alerted to that fact. He doesn't do anything. He does wait two weeks, and then he goes to Kruger and orders some tests. But that product is on the shelf. It's being sold. Customers are buying it. He finally, two weeks later, decides he's going to go to Kruger and order up some tests, and he does that. He orders the tests from Kruger, and two weeks later those come back, and they say this is not pomegranate juice. It's only then, within a few days, that he stops shipments out of the warehouse. But keep in mind, there's stuff on the shelf. And that's the point I wanted to raise. There was testimony, but it was an opinion of Mr. Hatchigan as to how long the product would remain on the shelf. He said, well, it's my opinion it could remain on the shelf up to six weeks. But his own flavorist, who was a consultant with the company, testified that it could have been on the product through its enjoy-by date. And we know the enjoy-by dates for these products went as far as August of 2007, which is the evidence the court relied upon. And keep in mind, the court looked at this issue and said, look, I heard Mr. Hatchigan's opinion. If you look at the court's finding in footnote one on page 39 of Appellant's record, and the court said, I looked at this issue, and I saw what Dr. Luna had to say. She was the economist that was hired on behalf of Appellant. And I find Mr. Hatchigan's opinion, quote, not persuasive. The court was entitled to hear the evidence from Mr. Hatchigan about his opinion, keeping in mind that they didn't pull the product off the shelf, that their own witness, their consultant, and his last name is escaping me, forgive me, the flavorist, Jim, and I can't think of it, I apologize, testified that certainly the product could remain on the shelf through its end date. So the court had that evidence and was free to conclude that the product was being sold to consumers. It was a little bit like I discussed in my closing argument to the court. It was like Russian roulette. A consumer went to that shelf, and sure, there may have been better, improved, or maybe even 100 percent pomegranate juice now on the shelf, but there may also have been adulterated pomegranate juice. And the consumer going to that shelf had no idea which was good, which was bad, and they were grabbing a bottle, and they very easily could have been adulterated and falsely advertised. My time is winding down. Can I just ask you one question? Please. It has nothing to do with the issues raised. What is the largest use of pomegranate juice? Largest use of pomegranate juice? I mean, it's literally a beverage. I call it cranberry juice on steroids. It's tart. But do people drink it, or do they put it in cocktails? Well, it's interesting. When the industry first began, there wasn't such a thing really as pomegranate juice. And POM Wonderful started this product, and people literally just drink it. And some people drink small doses of it, and other people drink a whole bottle of it. It's tart. If you like cranberry juice, you might like it. But if it's become sort of the in thing now, you find it in everything from martinis to lemonade, and it's all over the place now. It's pretty amazing how widely it's used today. It started out as just a beverage, and now it's used in drinks and all that. Right. All over the place. Thank you. Okay. Thank you very much. Thank you. Are there any further questions of the Attoll? No. All right. Thank you. The matter just argued is submitted for decision. That concludes the Court's calendar for this morning, and the Court stands adjourned. All rise. Thank you.
judges: Sedwick, Schroeder, Ikuta